# UNITED STATES DISTRICT COURT
# MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| ANTHONY VENABLE, | ) |
|       Plaintiff, | ) |
| v. | ) No. 3:18-cv-00148 |
| METROPOLITAN GOVERNMENT OF NASHVILLE AND DAVIDSON COUNTY, | ) |
|       Defendant. | ) |

## MEMORANDUM OPINION

Before the Court is a Motion for Summary Judgment by the Metropolitan Government of Nashville and Davidson County ("Metro") (Doc. No. 17), which has been fully briefed by the parties (Doc. Nos. 18, 21, & 26). For the reasons that follow, the Motion will be granted and this case will be dismissed.

## I. Factual Background

On July 6, 2016, Philando Castile, his girlfriend Diamond Reynolds, and their daughter were riding in a car in Falcon Heights, Minnesota, when they were pulled over by Jeronimo Yanez, a St. Anthony, Minnesota police officer. During the course of the traffic stop, Castile was shot four times, the aftermath of which Reynolds live-streamed on Facebook. The shooting captured the attention of individuals nationwide, and followed officer-involved shootings in Ferguson, Missouri (that led to protest and marches around the country, including in Nashville); Baton Rouge, Louisiana; and Dallas, Texas.

The day after the Falcon Heights shooting, Anthony Venable, who had been an officer with the Metropolitan Nashville and Davidson County Police Department ("MNPD") since December

2007, engaged in a Facebook conversation regarding that shooting. At the time, Venable was off-duty.

During the course of the conversation, Venable posted a number of comments, including:

- "Yeah, I would have done 5," in response to a comment that Castile was shot 4 times.

- "You don't shoot just one. If I use my weapon, I shoot to kill and stop the threat."

- "It's real and it's what every cop is trained to do. Move to Mexico."

- "There ARE bad cops!!! NO one is sitting here saying every cop is a good one. Ha. Why are you not talking about how many white people are killed by cops every day!?!?!?!? You are given statistics that more whites are killed by cops than blacks yet you still stay on the issue of feeling sorry for blacks or only post if a black is involved. You're blind"

- "Obviously he would smell it [the odor of marijuana]. Watch the video. The woman even says oh and we have weed in the car. Lol you don't know facts and you don't know police work You sit on the outside and judge what you only see not what you KNOW. If you want to see how it is you get your ASS up and strap on a vest and 25lbs of gear and you go out and put your pretty little life on the line every f***king day."

- "Stop bitching about the people who protect you."

(Doc. No. 17-1, Administrative Record ("AR") at 370-376). One participant in the Facebook conversation warned Venable that he could be in "serious trouble" based on the "grossly unprofessional" statements. Another expressed the hope that Venable's comments not "go viral." (Id. at 251).

In posting his comments, Venable never stated he was an MNPD officer. Nevertheless, within minutes of the postings, Sergeant James Capps of MNPD's Office of Professional Accountability received a complaint about Venable from Alena Chandler of Madison, Alabama who

was one of the participants in the conversation. An hour later, David McMurray, a Madison Chamber of Commerce board member, sent a complaint to a Community Precinct Coordinator at MNPD after being notified of Venable's comments by David Luciana of Akron, Ohio, who had seen the posts. Venable was immediately decommissioned, meaning that his policing authority was temporarily suspended pending an investigation. Venable's squad car and police equipment were confiscated that same afternoon, and a press release was issued that stated:

> **Officer Venable Decommissioned; Under Investigation for Facebook Post**
>
> July 7, 2014
>
> FOR IMMEDIATE RELEASE
>
> Chief Steve Anderson this afternoon directed that Hermitage Precinct midnight shift Officer Anthony Venable be immediately decommissioned pending the results of an internal investigation into a post he made from his personal Facebook account referencing the police-involved shooting in Falcon Heights, Minnesota.
>
> Hermitage Precinct supervisors became aware of the post at 3 p.m., in which Venable, during a Facebook conversation wrote, "Yeah. I would have done 5," an apparent reference to the number of shots in the Minnesota case. When questioned by a supervisor late this afternoon, Venable acknowledged the post, but said it was a form of sarcasm directed at a person with whom he was electronically conversing on Facebook.
>
> The Office of Professional Accountability has began an investigation into the specific posting and Venable's Facebook conversation.

(Doc. No. 1, Complaint ¶ 13).

The same day as Venable's postings, MNPD Chief Steve Anderson issued a press release regarding the Baton Rouge and Falcon Heights shootings. Chief Anderson asked Nashville not to judge MNPD officers based on the actions of other police departments, and to believe in the MNPD. Chief Anderson also noted that MNPD officers are trained to de-escalate situations and not to use deadly force unless absolutely necessary, and only as a last option.

As Venable's posts were spreading on the internet, MNPD learned that a vigil was going to take place in Nashville on the Courthouse lawn. In order to stave off a potential protest that could turn violent or destructive, Metro held a prayer service in front of the Criminal Justice Center where clergy members, politicians, judges, police officers, and members of the community called for calm in Nashville, and prayed for the police officers who were ambushed in Dallas, Texas that led to the loss of five officers' lives. The prayer service was held on July 8, 2016, the day after Venable posted on Facebook.

Metro asserts that Venable's Facebook comments were widely shared on the internet, reaching places as diverse as the United Kingdom, Miami Florida, and Memphis, Tennessee. Venable disputes this, claiming that his actual posts were not shared. Instead, an individual named Ed Austin, who Venable did not know, created a composite utilizing screenshots of (1) Venable's Facebook page, (2) two comments from the Facebook conversation of July 7, 2017 in which Venable said, "Yeah. I would have done 5"; and (3) a picture of Venable and Chief Anderson when Venable was named "Officer of the Year." (Doc. No. 24 at 8-9). Nevertheless, Venable concedes this "manipulated" post was shared on the internet over 125 times. He also concedes that in the context of the composite created by Austin, the comments could be taken negatively by both his co-workers and the MNPD, although he believes that his comments were not unprofessional because they were meant to be sarcastic.

Venable was charged with conduct unbecoming an officer. He was dismissed effective February 15, 2017, based upon the following charge:

> **Charge #1**
> **MNPD Manual 4.20.040 Deportment and Personal Appearance**
> **Personal Behavior: D. Conduct Unbecoming an Employee of the Department**

1. The conduct of department employees, on- or off-duty, may reflect directly or indirectly upon the Department, therefore, a police department employee's ability to perform his or her duties is dependent upon the respect and confidence communities have for the representatives of the law enforcement agency generally.

2. A police officer is the most conspicuous representative of government, and to the majority of the people, is a symbol of stability and authority upon whom they can rely. An officer's conduct is closely scrutinized, and when the officer's actions are found to be excessive, unwarranted, or unjustified, they are criticized far more severely than comparable conduct of persons in other walks of life.

3. Employees shall at all time conduct themselves in a manner which does not bring discredit to themselves, the Department, or the City.

**The comment you posted on Facebook, "Yeah. I would have done five" reflected negatively on the department and its members and did not protect the department's reputation. This incident created a disruption in the workplace which not only affected the Metropolitan Nashville Police Department, but also Metro Government as a whole.**

(Doc. No. 17-1, at 383-83) (emphasis in original).

Venable appealed his dismissal to the Civil Service Commission ("Commission"), and the matter was heard by Administrative Law Judge ("ALJ") Steve Darnell on November 14, 2017. On December 28, 2017, ALJ Darnell entered an Initial Order determining that Venable's conduct warranted a thirty (30) days suspension, and recommended that Venable be reinstated. (Doc. No. 17-1 at 12). Ultimately, after some procedural wrangling that is unnecessary to now recount, the Commission entered a Supplemental Final Order effectively vacating the Administrative Law Judge's Initial Order and finding that termination of Venable's employment as a MNPD officer was warranted, thereby reinstating the decision of the Chief Anderson to terminate Venable. While this action was pending, Venable dismissed a Chancery Court action that he had filed in relation to the

5

treatment he received by the MNPD.[1]

During the same general time period as Venable's postings, another police officer was disciplined because of his actions on Facebook. Specifically, in July 2016 – around the time that five white officers were killed in Dallas by an African-American man – Officer Chris Taylor, an African-American, posted a picture of Bobby Seale and Huey Newton, the co-founders of the Black Panther Party, as his Facebook profile picture. Officer Taylor received a 10-day suspension relating to this post, and no press release was issued about the incident. Taylor had never received any such prior discipline. Venable, on the other hand, was suspended for 16 days for conduct unbecoming an officer the year before he was terminated.[2]

Based on these events, Venable filed a four-count Complaint in this Court. He alleges that his rights to free speech under the United States and Tennessee Constitutions were violated (Counts I and 2). He also claims that he was deprived of his Fourteenth Amendment rights to equal protection (Count III) and due process.

## II. Standard of Review

The standards governing summary judgment have been restated on countless occasions and, from the filings that have been submitted, are obviously understood by the parties. It suffices to note: (1) summary judgment is only appropriate where there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law, Fed. R. Civ. P. 56(a); (2) the facts and

---

[1] After the Court received notice of this dismissal, the parties were instructed to file briefs regarding the impact of that dismissal on the present matter, which they did (Doc. Nos. 30, 31).

[2] The Taylor incident is listed by both parties in their respective statements of fact, but Venable does not make any arguments about Taylor in his response brief. Presumably this is because he and Taylor were not similarly situated, a point Venable concedes in response to Metro's statement of facts by admitting that "Taylor's situation is distinguishable from Mr. Venable's[.]" (Doc. No. 24 at 12).

inferences must be construed in favor of the nonmoving party, Van Gorder v. Grand Trunk W. R.R., Inc., 509 F.3d 265, 268 (6th Cir. 2007); (3) the Court does not weigh the evidence, or judge the credibility of witnesses when ruling on the motion, Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 249 (1986); and (4) the mere existence of a scintilla of evidence in support of the nonmoving party's position is insufficient to survive summary judgment, Rodgers v. Banks, 344 F.3d 587, 595 (6th Cir. 2003).

### III. Legal Analysis

Although Venable's Complaint is in four Counts, in response to the motion for summary judgment he concedes and withdraws his equal protection claim based on Engquist v. Oregon Dept. of Agr., 128 S.Ct. 2146, 2156 (2008), which held that a "class-of-one" theory of equal protection does not apply in the public employment context. That leaves his retaliation claims under the First Amendment and the Tennessee Constitution, and his Fourteenth Amendment due process claim. All three of the remaining claims fail not only because they are barred by res judicata, but also because they fail on the merits.

**A. Res Judicata**

Res judicata precludes both claims and issues, Gutierrez v. Lynch, 826 F.2d 1534, 1537 n.1 (6th Cir. 1987), and has four elements: (1) a final decision on the merits by a court of competent jurisdiction; (2) a subsequent action between the same parties or their privies; (3) an issue in the subsequent action which was litigated or which should have been litigated in the prior action; and (4) an identity of the causes of action." Rawe v. Liberty Mut. Fire Ins. Co., 462 F.3d 521, 528 (6th Cir. 2006). "State-court judgments are given the same preclusive effect under the doctrines of res judicata and collateral estoppel as they would receive in courts of the rendering state." Anderson

v. City of Blue Ash, 798 F.3d 338, 350 (6th Cir. 2015). Further, "'[r]es judicata applies in an administrative law context following a trial type hearing,'" and this includes decisions of the Tennessee Civil Service Commission. Eckerman v. Tenn. Dep't of Safety, 636 F.3d 202, 210 (6th Cir. 2010) (quoting Drummond v. Comm'r of Soc. Sec., 126 F.3d 837, 841 (6th Cir.1997)).

In this case, a hearing was held before ALJ Darnell on November 14, 2017, during which witnesses testified under oath and exhibits were introduced into the record in accordance with the Tennessee Rules of Evidence. (Doc. No. 17-1 at 132). This included Deputy Chief Johnson who testified that the complaint from the Madison Chamber of Commerce was particularly concerning because the MNPD makes a pointed effort to maintain positive relationship with community groups, averaging six meetings per day with such organizations. Anderson also expressed concerns about Venable being an effective officer because citizens might second-guess his motives or underlying thinking based on the public comments he made. (Id. at 175-78). Deputy Chief Henry also testified. In his opinion, it was inappropriate for a police officer to make the statements Venable made, particularly when the statements followed a number of controversial shootings. Henry also testified that Venable's comments required MNPD to become proactive regarding the protest/vigil that was scheduled to be held on the courthouse lawn. Further, Henry opined that the comments affected the rank-and-file officers because they are on the front line and receive the bulk of the criticism from the public when it is unhappy. (Id. at 201-03).

On December 28, 2017, ALJ Darnell issued an "Initial Order" (id. at 182), containing Findings of Fact and Conclusions of Law. Among other things, ALJ Darnell found that Venable's actions constituted conduct unbecoming a police officer, but determined that a 30-day suspension was a more appropriate sanction. The Initial Order was appealed to the Chancery Court, which

remanded the matter and ordered the Commission to supplement its conclusions of law, specifically as they related to the reasons why termination was appropriate and "to address the Petitioner's as-applied constitutional challenges." (Doc. No. 16-1 at 3).

On remand, the Commission entered Findings of Fact that included the following: (1) "Venable's own statements made it clear through his postings on Facebook that he was a police officer living in Nashville"; (2) MNPD officers are not trained to "shoot to kill"; (3) MNPD received complaints from Chandler and the Madison Chamber of Commerce; (4) "Venable's Facebook Comments went viral"; and (6) a Google search readily identified Venable as a Nashville police officer. (Doc. No. 17-4 at 2-4).The Commission also found, as a fact, that "Venable's comments affected other MNPD officer" because the average citizen could assume that Nashville police shared his viewpoint. In its Conclusions of Law, the Commission found that Venable's termination did not violate the First Amendment or the Tennessee Constitution "[u]nder the balancing test articulated in Pickering," nor was there a due process violation. (Id. at 6).

Clearly, the same issues in this case were raised, litigated, and decided in the proceedings before the Commission, and the decision of the Commission became final because Venable chose not to pursue an appeal in the Chancery Court. See, Tenn. Code Ann. 4-5-322(b) (requiring that petitions for judicial review be filed in the Chancery Court within 60 days of an agency's final order). Because Venable had a full and fair opportunity to litigate his claims before the Commission, his present claims are barred by res judicata. They also fail on the merits.

**B. First Amendment**

    **1. Federal Constitution**

Venable claims that MNPD's decision to terminate his employment "was retaliatory in

9

nature and based, in whole or in part, on his exercise of his protected free speech activity on a matter of inherent public concern." (Doc. No. 1 Complaint ¶ 54). To establish a First Amendment retaliation claim, Venable must prove that: "(1) [he] engaged in constitutionally protected conduct; (2) an adverse action was taken against [him] that would deter a person of ordinary firmness from continuing to engage in that conduct; and (3) the adverse action was motivated at least in part by [his] protected conduct." Fritz v. Charter Twp. of Comstock, 592 F.3d 718, 723 (6th Cir. 2010) (citing Mezibov v. Allen, 411 F.3d 712, 717 (6th Cir. 2005); Thaddeus–X v. Blatter, 175 F.3d 378, 394 (6th Cir.1999) (en banc)).

In Pickering v. Board of Education, 391 U.S. 563, 568 (1968), the Supreme Court held that the First Amendment provides protection to public employees to exercise the right of free speech without risk of retaliation by their employer if the speech in question is "on matters of public interest." That protection, however, is not absolute because "the State has interests as an employer in regulating the speech of its employees that differ significantly from those it possesses in connection with regulation of the speech of the citizenry in general." Id. "The problem in any case is to arrive at an appropriate balance," id., and this "calls for weighing the plaintiff's 'right to speak on a matter of public concern against 'the interest of the State, as an employer, in promoting the efficiency of the public services it performs through its employees,'" Lac Vieux Desert Band of Lake Superior Chippewa Indians v. Mich. Gaming Control Bd., 276 F.3d 876, 882 (6th Cir. 2002) (quoting Hardy v. Jefferson Comy. Coll., 260 F.3d 671, 679–80 (6th Cir. 2001)).

In Connick v. Myers, 461 U.S. 138 (1983), the Supreme Court incorporated the balancing required by Pickering into a two step analysis. "The threshold question . . . is whether [the employee's] speech may be 'fairly characterized as constituting speech on a matter of public

10

concern.'" Dambrot v. Cent. Mich. Univ., 55 F.3d 1177, 1186 (6th Cir. 1995) (quoting Matulin v. Vill. of Lodi, 862 F.2d 609, 612 (6th Cir. 1988)). "Second, if the speech is found to touch upon a matter of public concern, the court must then apply the Pickering balancing test." Id.

### a. *Matter of Public Concern*

"To be deemed a matter of public concern, the speech must 'relat[e] to any matter of political, social, or other concern to the community.'" Whitney v. City of Milan, 677 F.3d 292, 297 (6th Cir. 2012) (quoting Connick, 461 U.S. at 142). "'Whether speech touches on a matter of public concern is a question of law.'" Farhat v. Jopke, 370 F.3d 580, 589 (6th Cir. 2004) (citation omitted). Even accepting that "[t]he 'boundaries of the public concern test are not well defined,'" Mosholder v. Barnhardt, 679 F.3d 443, 449 (6th Cir. 2012) (citation omitted), there can be no doubt but that Venable's statements touched on matters of public concern: he was discussing his personal views about police officers and the dangers they face. Officer-involved shooting are a matter of public concern and the subject of nationwide debate. MNPD does not argue otherwise.

### b. *Metro's Interests*

"[C]itizens who enter government service 'must accept certain limitations on [their] freedoms,' including limitations on the scope of their First Amendment rights." Fox v. Traverse City Area Pub. Sch. Bd. of Educ., 605 F.3d 345, 348 (6th Cir. 2010) (quoting Garcetti v. Ceballos, 547 U.S. 410, 418 (2006)). Those limitations may be even greater when an individual is part of a public safety force. In fact, the Sixth Circuit has "long recognized 'the importance of deference' to law enforcement officials when speech threatens to undermine the functions of organizations charged with maintaining public safety." Gillis v. Miller, 845 F.3d 677, 684 (6th Cir. 2017) (citing Brown v. City of Trenton, 867 F.2d 318, 322 (6th Cir. 1989)); see also Cherry v. Pickell, 188 F.App'x 465,

11

469–70 (6th Cir. 2006) (citation omitted) ("[I]n the context of police departments, we have emphasized that the court should show 'deference to the city's judgment on the matter of discouraging public dissension within its safety forces.'"). "Thus, although it is not "the rule of this Circuit[ ] that public safety employers have a greater weight placed on their interests in order and discipline than other employers have in their institutional interests," the Sixth Circuit has "nevertheless recognized that law enforcement officials often have legitimate and powerful interests in regulating speech by their employees." Id. (quoting Mosholder, 679 F.3d at 451).

Venable acknowledges that "strong deference is given to public employers where 'close working relationships are essential to fulfilling public responsibilities,'" and that "[t]hese interests have particular resonance in the context of public safety department where loyalty, disciple, and workplace harmony are especially important." (Doc. No. 21 at 15-16) (citation omitted). He claims, however, that Metro has not tipped the Pickering balance in its favor because (1) his comments were meant to be sarcastic, and showed "an intense loyalty for his fellow police officers and the life and death situations [they face] everyday"; (2) while the comments may have "somewhat interfered" with police operations "the extent of that disruption is contested by the parties"; (3) "the likelihood that [his] post could damage the integrity of the Department . . . is a purely speculative concern in the instant case" because he did not identify himself as a Nashville police officer; and (4) there is "no direct evidence that [his] commentary generated any disharmony among his fellow employees in the police department." (Id.).

It may well be that Venable did not intend that his posts be taken seriously, but they were. Not only did one participant in the discussion warn him about the tenor of his remarks, another expressed the hopes that the remarks would not spread . Within minutes MNPD was informed about

12

the posts by at least two other individuals who did not find them humorous.

The speed with which citizens complained to the MNPD also undercuts Venable's suggestion that he should not be held accountable because he did not identify himself as a Nashville police officer. What he did do was to make the postings under his real name, and the postings clearly suggested that the poster was a police officer. It could not have surprised Venable that a rudimentary search on the internet would reveal that the "Anthony Venable" in Nashville making the posts was a MNPD officer. Besides, Venable does not claim that he did not make the postings, or that MNPD did not learn he was the one who made them.

Venable's arguments about the lack of "direct evidence" and "purely speculative concern[s]" ignores the testimony of Deputy Chiefs Johnson and Henry at the administrative hearing. It also neglects to consider Gillis. There, the Sixth Circuit joined the Second, Third, Seventh, Eighth, Ninth, and Eleventh Circuits in holding that "that evidence of actual disruption is not required." 845 F.3d at 685. This conclusion is based on the plurality opinion in Waters v. Churchill, 511 U.S. 661 (1994), wherein it was explained that the Supreme Court has

> ". . . consistently given greater deference to government predictions of harm used to justify restriction of employee speech than to predictions of harm used to justify restrictions on the speech of the public at large. Few of the examples we have discussed involve tangible, present interference with the agency's operation. The danger in them is mostly speculative. One could make a respectable argument that political activity by government employees is generally not harmful, or that high officials should allow more public dissent by their subordinates, . . . or that even in a government workplace the free market of ideas is superior to a command economy. *But we have given substantial weight to government employers' reasonable predictions of disruption*, even when the speech involved is on a matter of public concern, and even though when the government is acting as sovereign our review of legislative predictions of harm is considerably less deferential."

Gillis, 845 F.3d at 686 (emphasis in original) (internal citations omitted) (quoting Waters, 511 U.S. at 673-74). Thus, it is not "'necess[ary] for an employer to allow events to unfold to the extent that

13

the disruption of the office and the destruction of working relationships is manifest before taking action.'" Id. (quoting Anzaldua v. Ne. Ambulance & Fire Prot. Dist., 793 F.3d 822, 833–34 (8th Cir. 2015)). "Instead, when the employer does not offer such evidence, [a court] must assess whether the employer could reasonably predict that the employee speech would cause disruption, . . . in light of 'the manner, time and place' the speech was uttered, as well as 'the context in which the dispute arose.'" Id. (citation omitted).

Applying this standard, the Court has no hesitation in concluding that the MNPD could reasonably predict that Venable's comments would be disruptive to its mission and affect officer morale. The comments were made directly in response to a police shooting at a time when police shootings were a hot topic of debate among members of the public and the subject of nationwide protests. Making matters worse, the comments came on the very day that Police Chief Anderson issued a press release regarding the Baton Rouge and Falcon Heights shootings, in which he asked that the citizens of Nashville not judge its police officers by actions of police in other departments, and pointed out that officers shoot to kill only as a matter of last resort. At a minimum, Venable's postings could be viewed as undercutting or contradicting Chief Anderson. Moreover, as Venable's statements gained traction on the internet, MNPD learned of a call for a vigil or protest and to counteract that it felt it best to host a prayer service. Summary judgment is therefore warranted on Venable's First Amendment claim.

**2. State Constitution**

In addition to the arguments raised above, Venable argues that summary judgment on his state law free speech claim is inappropriate because Article I, Section 19 of the Tennessee Constitution is broader than the First Amendment. So far as relevant, it provides:

> The free communication of thoughts and opinions is one of the invaluable rights of man, and every citizen may freely speak, write and print on the subject, being responsible for the abuse of that liberty.

Tenn. Const. Art. I, § 19.

Insofar as Venable seeks to recover money damages, this claim fails at the outset. "[I]t is well established that Tennessee does not recognize an implied private cause of action for damages based upon violations of the Tennessee Constitution." Siler v. Scott, No. E201701112COAR3CV, 2019 WL 2306932, at *11 n.2 (Tenn. Ct. App. May 30, 2019); accord, Bennett v. Metro. Gov't of Nashville & Davidson Cty. 383 F. Supp. 3d 790, 808 (M.D. Tenn. 2019); Nance v. Kilpatrick, No. 1:18-CV-11-TAV-CHS, 2019 WL 1409847, at *14 (E.D. Tenn. Mar. 28, 2019).

The unavailability of money damages to the side, Venable has not established a basis for imposing liability, other than to argue that the Tennessee Supreme Court has indicated that it "may interpret Article I, § 19 of the State Constitution as providing greater freedom of expression than that provided in the Federal Constitution." Davis-Kidd Booksellers, Inc. v. McWherter, 866 S.W.2d 520, 525 (Tenn. 1993). This, of course, is in keeping with the Tennessee Supreme Court's "authority as the 'court of last resort' in interpreting the Constitution of Tennessee." Id. (quoting State v. Marshall, 859 S.W.2d 289 (Tenn. 1993)).

This Court's role is different. It is required to apply the law as written or already interpreted, and, in the case of unsettled law, to predict how the state's highest court would rule were it presented with the issue. Katz v. Fid. Nat. Title Ins. Co., 685 F.3d 588, 596 (6th Cir. 2012); F.D.I.C. v. Jeff Miller Stables, 573 F.3d 289, 298 (6th Cir. 2009). Although the Tennessee Supreme Court has recognized its authority to expand Article I, § 19 beyond the First Amendment, Venable has pointed to absolutely nothing that would suggest that the facts presented in this case are of such a nature that

the Tennessee Supreme Court would go beyond the Pickering balancing test in determining whether his free speech rights were violated. Summary judgment is warranted on this claim as well.

**C. Fourteenth Amendment**

In Count IV of the Complaint, Venable seeks a declaratory judgment that MNPD's Manual setting forth conduct unbecoming an officer is "unconstitutionally vague and overbroad . . . as applied in the instant case," in violation of the due process clause of the Fourteenth Amendment. (Doc. No. 1, Complaint ¶ 65). Because, however, Venable is only seeking declaratory relief on this claim, Metro argues that he lacks standing. Venable did not respond to this argument.

As Metro points out, it has been recently held that a former employee lacks standing to bring a claim for declaratory relief because he or she "is no longer affected by the challenged policy." Bennett v. Metro. Gov't of Nashville, 383 F. Supp. 3d 790, 809 (M.D. Tenn. 2019). This presumably is in keeping with the Supreme Court's instruction that "[p]ast exposure to illegal conduct does not in itself show a present case or controversy regarding injunctive relief . . . if unaccompanied by any continuing, present adverse effects." City of Los Angeles v. Lyons, 461 U.S. 95, 102 (1983). After all, "'Article III standing ultimately turns on whether a plaintiff gets something (other than moral satisfaction) if the plaintiff wins.'" Bennett, 383 F.Supp. 3d at 809 (quoting Drutis v. Rand McNally & Co., 499 F.3d 608, 612 (6th Cir. 2007)). Where a declaration does not change the relationship between the parties, the theory goes, victory lies only in "the moral satisfaction of knowing that a federal court concluded that his rights had been violated." Hewitt v. Helms, 482 U.S. 755, 762 (1987).

Metro argues that Venable could only claim a hollow victory were he to prevail on his due process claim because, while he may have "suffered an injury in fact" that was caused by "the

conduct complained of," his injury "will [not] be redressed by a favorable decision," Lujan v. Defenders of Wildlife, 504 U.S. 555, 560–561 (1992), because he will not be rehired as a MNPD police officer. However, Venable may want to continue his career in law enforcement, and another "black mark" on his employment record for conduct unbecoming an officer could thwart any such effort. See Hershinow v. Bonamarte, 735 F.2d 264, 266 (7th Cir. 1984) (noting that "a police officer who is suspended, however briefly, on the ground of unprofessional conduct has a black mark against him that may impede his advancement and reduce his chances of finding a good job elsewhere."). This may be sufficient to establish standing. See Lutheran Church-Missouri Synod v. F.C.C., 141 F.3d 344, 348 (D.C. Cir. 1998) (church had standing to challenge FCC's determination regarding equal employment opportunities because the decision was "a black mark on the Church's previously spotless licensing record and could affect its chances of license renewal down the road"); Coe v. Hous. Auth. of City of Milwaukee, No. 14-CV-0022, 2016 WL 393955, at *2 (E.D. Wis. Feb. 1, 2016) (standing existed where plaintiff, a Section 8 housing tenant, was terminated from the program because this could affect to ability to obtain such housing in the future).

Turning to the merits, Venable argues that the "vagueness" of the "conduct unbecoming" policy set forth in MNPD Manual 4.20.040 "is self-evident." (Doc. No. 1, Complaint ¶ 64). This sounds more like a facial challenge to the policy than the as-applied challenge alleged in the Complaint. Either way, the claim fails.

In the factual background section, this Court set forth verbatim MNPD Manual 4.30.040, the upshot of which is that police department "[e]mployees shall at all times conduct themselves in a manner which does not bring discredit to themselves, the Department, or the City." (Doc. No. 1,

Complaint ¶ 64). This phrase is undoubtedly capacious. "[N]evertheless, [it] provide[s] adequate notice to police officers that their conduct, both on and off duty, must meet a high standard of comportment.'" Flanagan v. Munger, 890 F.2d 1557, 1570 (10th Cir. 1989) (quoting Puzick v. City of Colorado Springs, 680 P.2d 1283, 1287 (Colo. App. 1983)). Indeed, virtually identical language has been upheld against facial challenges. See Id. at 1569 n.12 (upholding police department policy that described "conduct unbecoming a police officer" as including "that which brings the Department into disrepute or reflects discredit upon the officer as a Member of the Department, or that which impairs the operation or efficiency of the Department or Member"); Aiello v. City of Wilmington, 623 F.2d 845 (3d Cir. 1980) (rejecting both vagueness and overbreadth challenges to regulations requiring firemen to "refrain from conduct unbecoming a fireman and a gentleman whether on or off duty"); Davis v. Williams, 617 F.2d 1100 (5th Cir. 1980) (upholding regulation permitting discharge for "conduct prejudicial to the good order of the fire department"); Jolly v. Univ. of N. C, No. 7:09-CV-136-B0, 2010 WL 2024094, at *2 (E.D.N.C. May 19, 2010) (finding that policy which defined "just cause" for dismissal as including "conduct unbecoming a State employee that is detrimental to State service" was not vague).

Moreover, a party challenging a policy as vague or overbroad has the burden "to demonstrate a realistic danger that the [regulation] will significantly compromise recognized First Amendment protections of individuals not before the Court," City Council of Los Angeles v. Vincent, 466 U.S. 789, 802 (1984), something Venable does not even attempt to do. Perhaps this is because of the difficulty in making such a showing. See, United States v. Salerno, 481 U.S. 739, 745 (1987) ("A facial challenge to a legislative Act, is, of course, the most difficult challenge to mount successfully, since the challenger must establish that no set of circumstances exists under which the Act would

be valid."); Am. Booksellers Found. for Free Expression v. Strickland, 601 F.3d 622, 627 (6th Cir. 2010) (stating that in order to show a statute is unconstitutionally vague or overbroad, a party "must demonstrate from the text of the statute and from actual facts that a substantial number of instances exist in which the law cannot be applied constitutionally").

Venable has also not established that the conduct unbecoming policy is unconstitutional as applied to him. Given the "limitations in the English language," it "is not feasible or necessary for the Government to spell out in detail all that conduct which will result in [termination]," and even the "most conscientious of codes that define prohibited conduct of employees include 'catchall' clauses prohibiting employee 'misconduct,' 'immorality,' or 'conduct unbecoming.'" Arnett v. Kennedy, 416 U.S. 134, 159 (1974) (citation omitted). The key question is whether a "reasonable person can understand [the policy's] meaning," Deja Vu of Cincinnati, L.L.C. v. Union Twp. Bd. of Trustees, 411 F.3d 777, 798 (6th Cir. 2005), and "act accordingly," Grayned v. City of Rockford, 408 U.S. 104, 108 (1972).

In addition to the "not bring discredit" language, the MNPD policy contains an explanation of why police officers are held to a higher standard, and why inappropriate conduct can be detrimental to the department. An ordinary person, exercising ordinary common sense, could understand that Venable's inflammatory Facebook comments, where he drew upon his law enforcement background, would reflect negatively on the MNPD and constitute a violation of the Conduct Unbecoming policy. Any doubt about this is eliminated by warning statements of other participants that his comments were "grossly unprofessional," and could get him "in serious trouble."

## IV. Conclusion

For the foregoing reasons, Metro's Motion for Summary Judgment (Doc. No. 17) will be granted on all of Venable's claims.

An appropriate Order will enter.

_____
WAVERLY D. CRENSHAW, JR.
CHIEF UNITED STATES DISTRICT JUDGE